## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0:18-cr-120-ADM-KMM-1 |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Dwight Frederick Barnes<br>Defendant. | |

Defendant Dwight Frederick Barnes has filed motions to suppress evidence obtained during the execution of several search warrants and a warrantless arrest. (ECF Nos. 43, 51)  He also seeks to dismiss the Indictment against him on a variety of grounds.  (ECF No. 49.)  For the reasons discussed below, the Court recommends that Mr. Barnes's motions be DENIED.

## I.    Factual Background

An investigation into Mr. Barnes for drug trafficking began in mid-July 2017 led by Rochester Police Department Investigators Shamus Ryan and Kelly McMillin. (Transcript of the Dec. 4, 2018 Motions Hearing at 27.)  Around that time, a confidential informant advised Investigator Ryan that he knew of an area drug dealer named "New York," and provided him with New York's phone number, ending in -9283.  (*Id.*; *see also* Govt. Ex. 1 at 000550.)  Under Investigator Ryan's direction and supervision, that informant called the -9283 phone number in order to set up a controlled buy.  (Tr. 27–28.)  The man who answered the other line had a deep and distinctive voice, one that Investigator Ryan would later testify he recognized as belonging to Mr. Barnes.  Investigator Ryan instructed the informant to arrange to purchase $500 worth of drugs.  New York told the informant to call back later, and when he did, the informant was instructed to meet a man named Chad at a specified address.  (*Id.* at 28.)  However, the controlled buy ultimately fell through.  (*Id.*)

Although the planned buy did not occur, the investigation continued. Investigator McMillin spoke with a different informant, who corroborated some of what Investigator Ryan had already learned. A third informant provided information that helped further develop a picture of New York. Ultimately, the officers learned that New York was a black man known to be one of the largest drug dealers in Rochester. (Govt. Ex. 1.) He regularly drove a Dodge Charger, and his phone number matched the one that had been used to set up the unsuccessful controlled buy. (Tr. 29, 31–32, 34.) New York was an alias known by the Rochester Police Department to be used by Mr. Barnes, whose distinctive voice on unrelated body camera footage matched that of the man who answered New York's phone. (29, 32–33.) And Mr. Barnes had been observed driving a Dodge Charger during past traffic stops and surveillance. (Tr. 31.) Armed with this information, the investigators sought search warrants.

## A.    The Warrants

Investigator McMillin applied for a pen register, trap and trace, and tracking warrant for the phone associated with the -9283 number on August 22, 2017. The affidavit contained two mistakes. First, an erroneous phone number was put in the caption of the affidavit, although that incorrect number was not repeated in the affidavit or the warrant itself. (Govt. Ex. 1.) Second, Investigator McMillin incorrectly wrote that Investigator Ryan had spoken with the informant that had given them the -9283 number in August 2017, even though the conversation had actually occurred in July. (*Compare* Govt. Ex. 1 at 000550 *with* Tr. 27.) Regardless, the warrant was issued by Judge Stevens of Olmstead County and executed on the same day.

Investigator McMillin applied for another pen register, trap and trace, and tracking warrant for a business phone number associated with Mr. Barnes, ending in -4603, on September 6, 2017. The first several paragraphs of the affidavit were essentially copied from the previous warrant, with one significant difference. In the fourth paragraph, which describes the phone call and attempted controlled buy, the affidavit omits the fact that the call took place using the -9283 number, not the -4603 number that the warrant was being requested for. (*Compare* Govt. Ex. 1 at 000550 *with* Govt. Ex. 2 at 000520.) Instead, the application states that the call had been made to "this phone number," arguably implying that it was made to the phone for which the

second tracking warrant was being sought, -4603. Additional information specifically regarding Mr. Barnes's regular use of the -4603 number was also added to the affidavit. (Govt. Ex. 2 at 000520–21.) The affidavit described that the number had been used for calls from an inmate at a local jail as well as for calls between Mr. Barnes and the Rochester Police Department. The warrant was issued by Judge Chase of Olmstead County and executed the same day.

Several other warrants at issue in this motion were issued in the months of September and October. On September 28, 2017, a search warrant was issued for Mr. Barnes's business Gmail account, lifechangingfinances@gmail.com. (Govt. Ex. 4.) On October 13, 2017, investigators applied for and were issued a search warrant for Mr. Barnes's personal Gmail account, dfbarnes@gmail.com. (Govt. Ex. 3.) Each of these warrants directed broad seizure of all data associated with these accounts, followed by a more targeted review and analysis of the seized information, in order to locate data associated with criminal activity.

The final warrant at issue sought account ownership information, current balances, and transaction records for Mr. Barnes's personal and business bank accounts at Wells Fargo Bank. (Govt. Ex. 7.) This warrant has an unusual procedural history. It was issued on October 16, 2017 and executed on the same day. (Govt. Ex. 7 at 00001989.) However, it was returned more than a year later, on November 5, 2018. Furthermore, the return was not filed with the Olmstead County Clerk until December 12, 2018. (*Id.*) It was later discovered that the search warrant had inadvertently not been included in the filing, so the return was later refiled on February 12, 2019. (*Id.* at 00002003.)

## B.    Additional Investigation

Throughout the investigation, officers learned of Mr. Barnes's alleged involvement in trafficking through a variety of other sources. Investigator Ryan learned that while Mr. Barnes was incarcerated in October 2016, jail staff had observed him involved in suspicious activity. Mr. Barnes was on work release (released to work during the day, but returned to the jail at night), and on his return from work, staff observed Mr. Barnes with "stacks of hundred dollar bills." (Tr. 30.)

3

They also overheard Mr. Barnes speaking with another inmate about packaging items in plastic. (*Id.*) Jail staff believed this conversation referred to drugs. (*Id.*)

Mr. Barnes had multiple interactions with law enforcement, and on at least one occasion had bragged to officers that he owned several nice vehicles, that he paid for everything in cash, and told the officers that they must be jealous because they could not live like he did. (*Id.* at 31.) Suspecting that this cash may not be from legitimate sources, investigating officers requested tax returns for Mr. Barnes for 2014–2016, but found that he had not filed any taxes for those years. (*Id.*) Investigator Ryan also considered the vehicles that Mr. Barnes had been seen driving during interactions with law enforcement and surveillance, including a 2011 Cadillac Escalade, a 2014 Dodge Charger, and a 2017 Can-Am Spyder. (*Id.* at 34.) Investigator Ryan learned that none of these vehicles were in Mr. Barnes's name—the registered owner was an individual that law enforcement never saw, despite the significant surveillance conducted during the investigation. (*Id.*) Officers went to the dealerships where the cars had been purchased and learned that the registered owner of the vehicles had purchased them with Mr. Barnes in tow. (*Id.*) The salespeople informed officers that in each instance, it appeared that Mr. Barnes, and not the registered owner, was making the decisions. (*Id.* at 35.) Investigator Ryan testified that in his experience, putting vehicles in another person's name is indicative of criminal activity because it is intended to evade law enforcement. (*Id.*)

Investigator Ryan identified at least two other customers of Mr. Barnes who officers hoped would cooperate with law enforcement and participate in a controlled drug buy. (*Id.* at 36.) However, the individuals refused to participate in any undercover transactions, claiming that Mr. Barnes was incredibly dangerous, and they were "deathly afraid" of him. (*Id.* at 37.) While the individuals were unwilling to participate in a buy, they did provide information to law enforcement. In August of 2017, one customer described New York as an individual who drove an Escalade from whom they had purchased methamphetamine at least five times in the previous month. (*Id.* at 38; *see also* Govt. Ex. 7 at 0002035.)

Another customer knew Mr. Barnes by name and knew that he often went by New York. (*Id.* at 39.) She told investigators that she had purchased two to three pounds of methamphetamine in total from Mr. Barnes since he had been released

4

from prison.  (*Id.*)  She also knew how he brought drugs into Rochester.  (*Id.* at 40.)
According to the informant, Mr. Barnes had a brother who lived in Las Vegas who
shipped drugs to Minnesota for him.  (Tr. 59.)  These drugs were shipped to various
addresses within Rochester.  (Tr. 40.)  Mr. Barnes did not pick the packages up
himself, but instead sent others to do so.  (*Id.*)  One of the addresses that Mr. Barnes
used was the 11th Street address of the deceased father of a man named Eric
Hoerner.  (*Id.*)

### C.    Mr. Barnes's Arrest

On October 20, 2017, Rochester Police responded to a 911 call just before
11:00 a.m. regarding an incident occurring at the 11th Street Hoerner address.  (Tr.
63–64.)  Shawna Cada, Eric Hoerner's girlfriend, called 911 after a package was
dropped off at the doorstep of the 11th Street house.  She informed the operator that
two men came to the house and wanted to retrieve the package from the house.  (*Id.*
at 46.)  She told them she would not give them the package, and when it was delivered
at 10:57 a.m., she brought it inside.  (*Id.*)  Shortly thereafter, however, one of the men
returned to the door and demanded the package.  (*Id.*)  Ms. Cada refused and took a
picture of the person at the door.  (*Id.* at 64.)  The picture was of a black man in a
dark sweatshirt, but it was not Mr. Barnes.  (*Id.*; *see also* Def. Ex. G.)  However, GPS
data from Mr. Barnes's phone placed him within a block and a half of the address just
minutes before the man came to Ms. Cada's door.  (Tr. 74–75.)

Mr. Hoerner arrived at the 11th Street address shortly after the police arrived
and claimed it was "New York" who was trying to get the package.  Mr. Hoerner
explained that New York had come by earlier that morning, driving a white Dodge
Charger.  (Tr. 46.)  Mr. Barnes asked Mr. Hoerner if he could have packages sent to
the 11th Street address.  (Tr. 46, 73.)  Mr. Hoerner told him that he was clean, not
involved in drugs anymore, and refused to have drugs delivered to the house.  (*Id.* at
46.)  Mr. Hoerner also told officers that Mr. Barnes had traveled to a restaurant near
the 11th Street address, Cheap Charlies, where Mr. Hoerner was eating lunch to try to
convince him to release the package.  (*Id.* at 47.)  Mr. Hoerner refused.  (*Id.*)

GPS tracking data corroborates much of Mr. Hoerner's description of events.
Investigator Ryan testified that the GPS location data collected as a result of the

phone tracking warrants "pinged" the location of the phone approximately every fifteen minutes. (*Id.* at 83.) This data revealed that Mr. Barnes's phone was at the 11th Street address at 10:20 a.m., about forty minutes before the package arrived. (*Id.* at 73, 83–84.) At approximately 10:54 a.m., three minutes before the package arrived at the 11th Street address, location data indicated that Mr. Barnes was within a block and a half of the residence. (*Id.* at 84.) However, no location data confirms or refutes that Mr. Barnes went to Cheap Charlies in between his visits to the 11th Street address. (*Id.* at 84–7.)

When officers opened the package at the 11th Street address, they found approximately two pounds of suspected methamphetamine. (*Id.*) Law enforcement officers decided to arrest Mr. Barnes. Using the phone they had already used to gain GPS data as to his whereabouts, officers located Mr. Barnes at a construction site sometime after noon. (*Id.* at 48, 82.) Mr. Barnes was not driving the Dodge Charger that Ms. Cada described, but instead had a different vehicle. (*Id.* at 48.) Mr. Barnes broke the cell phone he was carrying, and officers took him into custody. (*Id.*)

## II.    Analysis

Mr. Barnes challenges the pen register, trap and trace, and tracking warrants issued for both phone numbers associated with him for lacking probable cause. He also argues that the affidavit for the -4603 warrant contained serious misstatements that rendered it invalid. Mr. Barnes challenges the search warrants issued for his email accounts as overbroad. Additionally, he argues that his warrantless arrest was without probable cause. Finally, he seeks dismissal of his indictment as a remedy for several due process violations. The Court addresses each of Mr. Barnes's arguments in turn.

### A.    The Warrant for the -9283 Phone (the " -9283 warrant")

Mr. Barnes asserts that the -9283 tracking warrant was not based on an adequate showing of probable cause because the informants utilized by Officer McMillin were unreliable. However, a review of the information contained within the four corners of the warrant demonstrates that it was supported by an adequate showing of probable cause. Furthermore, the Court determines that even if probable cause did not exist, the *Leon* good faith exception would save the warrant.

6

### 1.    Probable Cause

The Fourth Amendment states that "no warrants shall issue, but upon probable cause."  The standard for determining whether a search warrant had probable cause to issue is well-established:

> Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances.  If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established.

*United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016) (quotations and citations omitted.)  A "common sense" approach should be used when determining whether probable cause has been established, considering all the evidence available.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *States v. Solomon*, 432 F.3d 824, 827 (8th Cir 2007).  In particular, applications and affidavits for search warrants "should be read with common sense and not in a grudging hyper technical fashion."  *United States v. Ryan*, 293 F.3d 1059, 1061 (8th Cir. 2002) (quoting *United States v. Goodson*, 165 F.3d 610, 613 (8th Cir. 1999) (internal quotation marks omitted).

When an affidavit contains information provided by one or more confidential informants, the reliability of that informant is critical to the determination of probable cause.  A confidential informant may be considered reliable in a number of circumstances, including when

> the information is based on his or her first-hand observations, or the informant has provided information against his or her penal interest or that implicates him or herself, or the informant's information is corroborated by another informant or by the investigating officers, even where the facts which are corroborated are seemingly innocuous.

*United States v. Mims*, 567 F. Supp. 2d, 1059, 1068 (D. Minn. 2008) (collecting cases). In circumstances where multiple informants provide information that is "reciprocally corroborative," that information can be enough to support a finding of probable cause.  *United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir. 1998).

Against this legal backdrop, it is clear that the information contained in the affidavit in support of the -9283 warrant established probable cause. In this case, three CIs provided information that Investigator Kelly McMillin relied upon. Each provided details to Investigator McMillin that corroborated the other's information. The first CI, $CI_1$,[1] is an individual who had previously provided reliable information to Investigator McMillin in other cases. (Govt. Ex. 1 at 000549.) $CI_1$ identified a black man using the nickname "New York" who is one of the biggest drug dealers in Rochester. (*Id.*) He told Investigator McMillin that New York was bringing cocaine and methamphetamine to Rochester to sell. (*Id.*)

A second CI, $CI_2$, provided corroborating information for $CI_1$'s information to Investigator McMillin's partner, Investigator Ryan. $CI_2$ informed Investigator Ryan that a black man named New York was selling drugs in Rochester. $CI_2$ knew other details about New York, such as his phone number, which was the -9283 number, and that New York drove a Dodge Charger. (*Id.* at 000550.) $CI_2$ told Investigator Ryan that he knew this information because he would contact New York to purchase narcotics. *Id.* At Investigator Ryan's behest and under his supervision, $CI_2$ placed a phone call to New York's -9283 number in an attempt to arrange a narcotics purchase from New York. Investigator Ryan recognized the voice on the phone call as Mr. Barnes, with whom he was familiar because he had previously viewed body camera footage of Mr. Barnes speaking with officers during an unrelated incident. *Id.*

A third CI, $CI_3$, corroborated much of $CI_1$ and $CI_2$'s information. Specifically, he informed Investigator Ryan that he knew of a black man nicknamed New York who was involved in the sale of drugs in Rochester. *Id.* $CI_3$ also told Investigator Ryan that New York drives a Dodge Charger and provided the same -9283 number New York's phone number. (*Id.*)

The mutually corroborative information provided by all three informants is enough to support finding that the CIs were reliable enough to provide probable cause that the -9283 phone number belonged to Mr. Barnes, who was involved in drug trafficking. *E.g.*, *Fulgham*, 143 F.3d at 401. That finding is strengthened by the

---

[1] For clarity's sake, the Court labels the confidential informants discussed in the warrants in the order that they appear in Government Exhibit 1.

fact that information beyond the CIs also corroborates their information. For example, Officer Ryan himself heard one of the informants arrange a drug transaction with Mr. Barnes, though the transaction was never completed. And Investigator Ryan had personally observed Ms. Barnes driving a Dodge Charger, both during traffic stops and while conducting surveillance. (Govt. Ex. 1 at 000550.) Mr. Barnes was also known to the Rochester Police Department, and his records indicated that he is a black male and is known to use the alias "New York." (*Id.*)

In sum, these facts provided more than a "fair probability" that evidence of drug trafficking would be found by tracking the location and communications made by the phone associated with the -9283 number. The affidavit that accompanied the -9283 warrant application was supported by sufficient probable cause. *E.g.*, *Notman*, 831 F.3d at 1088.

### 2.   *Leon* Good Faith Exception

Even had the -9283 warrant been based upon an insufficient showing of probable cause, the good faith exception would nonetheless preclude suppression. If "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," the good faith exception to the exclusionary rule applies, even if a court later determines that the warrant was invalid. *United States v. Hopkins*, 824 F.3d 726, 733 (8th Cir. 2016) (quoting *United States v. Leon*, 468 U.S. 897, 920 (1984)). However, the good faith exception is not without limitations. It cannot be invoked:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Cannon*, 703 F.3d 407, 412 (8th Cir. 2013).

Against this backdrop, it is clear that even if the -9283 warrant lacked probable cause, the good faith exception applies. Mr. Barnes does not accuse Investigator McMillin of intentionally and knowingly making a false statement in the affidavit for the -9283[2]; the issuing judge did not wholly abandon their judicial role; and there is no suggestion of facial deficiency. Finally, the information offered in support of the warrant is not so lacking in indicia of probable cause so that the belief in its validity is entirely unreasonable. On the contrary, because the Court concludes above that there was an adequate articulation of probable cause, law enforcement's belief in the same conclusion cannot be described as "entirely unreasonable."

## B.   The Warrant for the -4603 Phone (the " -4603 warrant")

Mr. Barnes challenges the validity of the -4603 warrant on several bases. First, he argues that probable cause did not exist for the warrant to be issued. Specifically, in addition to challenging the reliability of the affidavit's information as he did with respect to the first tracking application, Mr. Barnes argues that the information in the second tracking application was stale and that it failed to tie the phone number in question to any act of drug dealing. He also argues that intentional misstatements made in the affidavit for the -4603 warrant render that warrant invalid. For the reasons discussed below, the Court determines that none of these arguments carry the day. Finally, Mr. Barnes again argues that the warrant is so deficient that the *Leon* good faith exception does not apply.

### 1.   Probable Cause

Investigator McMillin swore to the affidavit that accompanied the -4603 warrant application. The first several paragraphs of the affidavit appear to copy-and-

---

[2] Mr. Barnes observes that an erroneous phone number appears in the caption of the affidavit but does not assert that this is anything more than carelessness, and an argument to the contrary finds no support in the record. The rest of the affidavit refers to the correct phone number, does not request a warrant based on the erroneous phone number, and no warrant for the erroneous phone number was issued. In light of these facts, the Court concludes that phone number misstatement is nothing more than a typographical error.

paste the CI information from the -9283 warrant application discussed above. For the same reasons, the Court finds that this CI information is well-corroborated and reliable. However, Mr. Barnes further challenges the information related to the -4603 warrant on additional grounds.

### (a)    Staleness

First, Mr. Barnes argues that the information in the affidavit was so old as to no longer support probable cause. (*See* ECF 63 at 12.) "[T]here is no bright-line test for determining when information is stale." *United States v. Morrison*, 594 F.3d 6262, 631 (8th Cir. 2010) (quoting *United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008)). Indeed, "[a] time lapse between the informant's disclosure and the search warrant's execution does not necessarily make probable cause fatally stale." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006). Instead, a court must examine time factors within the context of the specific case, including the nature of the criminal conduct under investigation. *Id.* In cases such as ongoing drug trafficking investigations, time lapses of weeks or months will not usually make the information stale. *Jeanetta*, 533 F.3d at 655; *see also United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) ("With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the reported last instance of suspect activity." (quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986))).

Considering the totality of the circumstances, the Court finds that the information provided by the CIs was not stale at the time of the -4603 warrant application. Mr. Barnes was being investigated for ongoing narcotics trafficking. This is not a case where a single sale was expected to take place at a certain time and date, after which the information is useless. Nor did the information at issue point to possession of narcotics at a particular place on a certain day. Instead, the information provided by the CIs "supported a belief [that Mr. Barnes] was engaged in an ongoing criminal enterprise…." *Jeanetta*, 533 F.3d at 655. "Where continuing criminal activity is suspected, the passage of time is less significant." *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998). In light of this reality, the Court finds that the information set forth in the affidavit was not so dated as to undermine the validity of the -4603 warrant.

### (b)   Probable Cause Phone Was Involved in Drug Dealing

Mr. Barnes's next challenge to the -4603 warrant is that, because there was no evidence linking the -4603 phone to Mr. Barnes's alleged criminal activities, there was no probable cause for the tracking warrant. The Court finds that this argument is without merit.

Of importance to this analysis is the information the warrant was seeking. The -4603 application sought a pen register, trap and trace, and tracking warrant. Specifically, officers sought an order directing the service associated with the -4603 phone to provide location and call data, not content of communications made with the phone. As discussed above, there was probable cause to believe that Mr. Barnes was involved in narcotics trafficking. If probable cause exists that Mr. Barnes regularly used the -4603 phone number, there was also probable cause to obtain tracking and call data. The evidence obtained from tracking Mr. Barnes's location through the phone could prove (or disprove) his involvement in drug trafficking activities, regardless of whether he also used the target phone to conduct those activities.

The Court finds that the -4603 warrant affidavit established such probable cause. Although the affidavit does not establish that Mr. Barnes owns the -4603 phone, it does provide probable cause to believe that he regularly uses the phone. Investigator Ryan spoke with Sandra Ewing, an employee of the Rochester Police Department. (Govt. Ex. 2 at 000520.) Ms. Ewing confirmed that Mr. Barnes contacted her using the -4603 number, identifying himself and speaking with Ms. Ewing on multiple occasions. (*Id.*) Ms. Ewing also returned phone calls to the -4603 number, which were answered by Mr. Barnes. (*Id.*) Furthermore, the affidavit describes a recording of a jail phone call that was made to the -4603 number. The individual who answered the phone was identified as Mr. Barnes based on his voice, which investigators were familiar with due to previously monitored calls and body camera footage as described above. (*Id.*) These facts clearly established that Mr. Barnes regularly used the -4603 phone, and when combined with the CI information previously discussed, provides probable cause to believe that tracking the phone would lead to evidence of drug trafficking.

2.   *Franks* Determination

Although Mr. Barnes does not make a formal request for a *Franks* hearing, he implies that one might be necessary due to two elements of erroneous information provided in the -4603 affidavit.  Despite the lack of a formal motion for a hearing, the Court is able to address this issue on the record already before it.

Generally, when a court reviews a warrant, it may only examine the information contained within the "four corners" of the warrant's affidavit.  *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014).  There is "a presumption of validity with respect to the affidavit supporting the search warrant."  *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  However, in limited circumstances, a defendant may obtain an evidentiary hearing, known as a "*Franks* hearing," to enable the court to look beyond the four corners of the affidavit and examine if the affidavit was submitted in bad faith.  A defendant may only obtain a *Franks* hearing if "(1) he makes a substantial preliminary showing that the affiant intentionally or recklessly included a false statement in the warrant affidavit, and (2) the false statement was necessary to the finding of probable cause."  *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (quotation and citation omitted).  In this case, Mr. Barnes has offered no evidence of intentional misrepresentations or even recklessness on the part of law enforcement.  But even had such a showing been made, neither of the alleged errors undermines the probable cause in the affidavit at issue.

The first alleged mistake is relatively minor.  The warrant states that Investigator Ryan spoke with CI$_2$ in August 2017.  (Govt. Ex. 2 at 000520.)  However, testimony at the motion hearing in this matter established that he actually spoke with CI$_2$ in mid-July 2017.  (*See* Tr. 27.)   This error alone does not require close analysis.

The second and more concerning misstatement is in the fourth paragraph of the affidavit to the -4603 warrant.  This paragraph is nearly identical to the fourth paragraph of the affidavit accompanying the -9283 warrant, except that the first application makes clear that the -9283 phone number was used to arrange the described attempted drug deal.  In contrast, the -4603 application is revised to remove the sentence tying the drug transaction to the -9283 number, but leaving the assertion that the drug deal was made with "this phone number" in place, a clearly inaccurate

statement.[3]  This is arguably a more concerning error.  And although there has been no showing of intentional conduct, the Court notes that both affidavits were prepared and sworn to by Officer McMillin, who must have been aware of both the truth and the contradiction.  Even could this factual landscape support an inference of recklessness on the part of law enforcement, however, suppression is nonetheless not required.

Once a defendant has met the threshold showing for a *Franks* hearing, the court must examine the affidavit with the false information corrected or excised, or the omitted information included.  *E.g.*, *Franks*, 438 U.S. at 155–56; *United States v. Jacobs*, 986 F.2d 1231, 1233–34 (8th Cir. 1993).  The revised warrant is invalid and the fruits of the search must be suppressed if the corrected application fails to establish probable cause.  *Franks*, 438 U.S. at 155–56.  In this case, the question is whether probable cause is lacking when the date of the conversation with CI$_2$ is corrected from August 2017 to July 2017, and when the omitted sentence describing the -9283 phone number is included.  The Court concludes that even if the information had been set forth correctly, probable cause still exists to support the -4603 warrant.

Correcting the date has little impact on the probable cause analysis because, as discussed above, the overall information provided was not stale when the warrant was issued.  CI$_2$'s information regarding New York's ongoing drug dealing supports a finding of probable cause in September 2017, whether that particular conversation took place in July 2017 or August 2017.  Similarly, making clear that CI$_2$'s phone call to New York was made to the -9283 number and not the -4603 number that the warrant sought to track does vitiate probable cause for several reasons.  First, the phone call still establishes probable cause that New York, known to be Mr. Barnes, was actively engaged in drug trafficking during the course of the investigation, regardless of the phone he used to do so.  Second, as explored above, numerous

---

[3] Compare the text of Government Exhibit 1 (the -9283 warrant): "The CI stated that 'New York' drives a Dodge Charger and is a black male.  The CI stated that 'New York's' phone number is [-9283].  The CI then placed a phone call to 'New York' at this phone number," with the text of Government Exhibit 2 (the -4603 warrant): "The CI stated that 'New York' drives a Dodge Charger and is a black male.  The CI then placed a phone call to 'New York' at this phone number."  The omission of the middle sentence in the -4603 warrant clearly leads the reader to believe that the phone call made by the CI was to the -4603 number, not the -9283 number.

references to the use of the correct -4603 number throughout the affidavit make it clear that Mr. Barnes regularly uses the second phone, giving rise to an inference that he may carry it with him when he engages in drug-related activities.  For many of the same reasons as discussed in subsection 1(b) above, therefore,  probable cause existed that evidence of drug trafficking would be found in a particular place, namely, the location information for Mr. Barnes's -4603 phone.

In sum, even if Mr. Barnes had satisfied the preliminary showing required by *Franks* to look beyond the four corners of the -4603 affidavit, the resulting corrected information still establishes probable cause to support the issuance of the warrant. Suppression on this basis is not required.

### 3.    *Leon*

Finally, Mr. Barnes argues that the misleading information in the affidavit renders *Leon* inapplicable.  However, because the Court has determined that Mr. Barnes has not established that a *Franks* violation occurred, it may proceed to a good faith analysis.  *United States v. Conant*, 799 F.3d 1195, 1202 (8th Cir. 2015); *United States v. Puckett*, 466 F.3d 626, 629–30 (8th Cir. 2006).  The Court concludes that even if the -4603 warrant was not based on sufficient probable cause, the *Leon* good faith exception to the exclusionary rule would prevent suppression.  As explored above, the alleged mistakes not only do not undermine the probable cause set forth in the warrant, but Mr. Barnes has offered no evidence on intentional or reckless conduct on the part of the officers.  As the above review demonstrates, the warrant application was neither facially deficient nor devoid of an adequate showing of probable cause as to render reliance on the resulting warrant unreasonable.

### C.    The Warrants for dfbarnes@gmail.com and lifechangingfinances@gmail.com

Mr. Barnes next challenges the warrants that were issued for two email accounts associated with him: dfbarnes@gmail.com and lifechangingfinances@gmail.com.  (Govt. Exs. 3, 4, collectively, "the Gmail warrants.")  Because Mr. Barnes's challenge to each of these warrants is the same, and

because the warrants themselves are substantially similar, the Court will consider them in tandem.  Mr. Barnes does not challenge the existence of probable cause for these warrants; instead, he argues that both were overbroad.  The Court disagrees.

A warrant "must particularly describe the things to be seized, as well as the place to be searched."  *Dalia v. United States*, 441 U.S. 238, 255 (1979) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).  This particularity requirement is met when the warrant is "sufficiently definite to enable the searching officers to identify the property authorized to be seized."  *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014).  Courts review the particularity of a warrant based on factors such as "the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case."  *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011).  The analysis should be practical and not hypertechnical.  *United States v. Peters*, 92 F.3d 768, 769–70 (8th Cir. 1996).

The Gmail warrants permit the seizure of substantial data from Google, the custodian of the information, for each Gmail account.  This includes all information regarding the email account, all records and historical search data associated with the email account, geolocation data associated with the account, and associated "files and content" from various Google services, including Hangouts, Picasa, Drive, Sheets, Sites, Voice, Google+ and PlusOne.  (Govt. Exs. 3 at 00001603–4, 4 at 000556–57.) The warrants then instruct law enforcement to review the data provided by Google to identify documents, files, and data relating to the specific offenses under investigation, including photographs of firearm or trafficking activities and email correspondence, social media activity, and web history relating to the same.  (Govt. Exs. 3 at 00001604–5, 4 at 000557–58.)  Each warrant provides a specific procedure for this review:

> The electronic communication services provide must provide all items in the accounts above, because the out-of-state electronic communications service provider has no reasonable means to distinguish evidence of the crimes from any other records contained within the sought after accounts.  Therefore, after the electronic communication services provider seizes the items and produces them to me, Affiant and/or other designated agents authorized to execute the warrant or assist therein will sort the items for evidence of the crimes articulated above,

which may be intermingled with innocent or innocuous documents or records. Files, documents, and data that are determined to be irrelevant to the crimes described herein will be segregated and not subject to further review.

(Govt. Ex. 3 at 00001605 ¶ d; *see also* Govt. Ex. 4 at 000558 ¶ d (same).) This two-phase approach to search and seizure of electronically stored information is specifically contemplated by Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure. The Advisory Committee notes to the 2009 Amendment of this rule are particularly instructive:

> Computers and other electronic storage media commonly contain such large amounts of information that it often impractical for law enforcement to review all of the information during execution of the warrant at the search location. This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.

*See also United States v. Beckman*, 786 F.3d 672, 680 n.6 (8th Cir. 2015).

Though this rule is primarily concerned with the time taken to execute the first phase of the warrant, the Court finds that it is a practical approach to the particularity requirement of the Fourth Amendment. There was no method by which Google or the law enforcement officers could distinguish evidence of crimes from Mr. Barnes's more innocent electronic data and files. Thus, as a practical matter, the seizure of all of Mr. Barnes's files and the later review of those files for evidence of criminal activity, was the most reasonable approach. *See United States v. Summage*, 481 F.3d 1075, 1079–80 (8th Cir. 2007) (finding that a warrant authorizing the broad seizure of all electronic media equipment and storage followed by an off-site analysis of the items seized met the particularity requirement); *see also United States v. Hassan*, No. 18-cr-26 (PJS/SER), 2018 WL 2344452 at *6 (D. Minn. May 8, 2018) ("[A] failure to anticipate where data may be located does not render a search warrant overly broad."), *report and recommendation adopted*, 2018 WL 2342902 (D. Minn. May 23, 2018). Mr. Barnes's argument that the email account warrants were overbroad is inconsistent with the law.

### D.    Delay in Return of the Wells Fargo Warrant

Mr. Barnes argues that the delay in the return of the Wells Fargo warrant provides an independent basis for its suppression.[4]  The Court disagrees.  Neither the federal rule of criminal procedure governing the return of search warrants nor its Minnesota statutory counterpart support a claim that failure to promptly return a warrant requires suppression of the items seized.  Rule 41(f) of the Federal Rules of Criminal Procedure describes the procedure for execution and return of search warrants.  After executing the warrant, Rule 41(f)(1)(D) requires the executing officer to "promptly return" the warrant, along with an inventory of items seized, to a designated magistrate judge.  Minnesota Statutes Section 626.17 states that an "officer must immediately return the warrant to the court…."  Neither rule defines "prompt" or "immediately, but the Court assumes that returning a warrant more than a year after it was executed is not prompt.  While the late return in this case is therefore a violation of the state statute, the question before the Court is whether this violation requires suppression of the collected evidence under the Fourth Amendment.  The Court concludes that it does not.

"Noncompliance with [Rule] 41 prerequisites does not automatically require the exclusion of evidence in a federal prosecution."  *United States v. Schoenheit*, 856 F.2d 74, 76 (8th Cir. 1988).  "When the government violates Rule 41, the Court may exclude the evidence described in the search warrant only 'if the defendant is prejudiced or if reckless disregard of proper procedure is evident.'"  *United States v. Beckmann*, 786 F.3d 672, 680 (8th Cir. 2015) (quoting *United States v. Mutschelknaus*, 592 F.3d 826, 829 (8th Cir. 2010); *see also United States v. Welch*, 811 F.3d 275, 280 (8th Cir. 2016) ("[A Rule 41] procedural violation is not per se an unreasonable search and seizure in violation of the Fourth Amendment.").

---

[4] To the extent that Mr. Barnes contests the late filing of the warrant return with the Olmstead County Clerk, he cites no authority to suggest that late filing of warrant documents provides a basis for suppression, and the Court finds none.  Furthermore, the Court notes that in this case, filing the warrant and its return with the court clerk appears to be a ministerial function of the state courts.  The Court finds no authority to suggest that failing to meet the ministerial requirements of a state court would give rise to Fourth Amendment concerns.

Minnesota Courts follow a similar rule.  Citing United States Supreme Court precedent, the Minnesota Supreme Court determined that failure to return a warrant did not require suppression, noting that "relatively minor irregularities in the execution of a search warrant which occur after a valid search and seizure are not 'constitutionally significant' and will not retroactively render the evidence seized inadmissible."  *State v. Mollberg*, 246 N.W.2d 463, 469 (Minn. 1976) (citing *Cady v. Dombrowski*, 413 U.S. 433 (1973); *see also State v. Steele*, No. C3-92-1309, 1993 WL 52154 at *1 (Minn. Ct. App. Mar. 2, 1993) ("Failure to comply with a warrant inventory return requirement does not mandate exclusion of evidence.")

Mr. Barnes has made no showing of prejudice resulting from the long-delayed return.[5]  To determine prejudice in such a case, the Court must determine whether the search would have occurred if proper procedure had been followed.  *United States v. Turner*, 781 F.3d 374, 387 (8th Cir. 2015).  If the search would have happened anyway, then no prejudice exists.  *Id.*  Here, the Court easily concludes that the search would have occurred regardless of the rule violation.  Mr. Barnes has also failed to make a showing of reckless disregard of proper procedure, and the record before the Court does not support such a finding.  Thus, the Court finds that no constitutional violation occurred by virtue of the late return.

## E.    Mr. Barnes's Arrest

Mr. Barnes challenges his warrantless arrest, arguing that officers did not have probable cause to arrest him on October 20th, 2017.  The Fourth Amendment permits warrantless arrests when the arresting officer has "probable cause to believe that criminal offense has been or is being committed."  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of arrest."  *Devenpeck*, 543 U.S. at 152.  Probable cause is present "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to

---

[5] In Mr. Barnes's comments to the Court, he repeatedly suggests that the late return of this warrant means that the warrant must be fabricated.  He has presented no evidence of fabrication, and the Court's extensive review of the record reveals none.  Thus, the Court finds no reason to address this argument further.

believe that the defendant has committed or is committing an offense." *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011.)

Where multiple officers have been involved in a case, the arresting officer need not have personal knowledge of all the facts that support probable cause. Instead, the collective knowledge of all investigating officers may be imputed to the arresting officer, provided there has been "some degree of communication." *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011); *see also United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). "This requirement serves to distinguish between officers functioning as a search team and officers acting as independent actors who merely happen to be investigating the same subject." *Robinson*, 664 F.3d at 704 (quotation omitted). Examining the totality of the circumstances and considering the information known to all officers involved, ample probable cause existed to arrest Mr. Barnes.

In arguing that probable cause for his arrest did not exist, Mr. Barnes overstates the importance of Mr. Hoerner's statements to the officers who responded to the October 20 911 call. Specifically, Mr. Barnes suggests that his arrest must be supported entirely by information gathered on the morning of October 20th, through the 911 call and the follow-up investigation. Although Mr. Hoerner's and Ms. Cada's representations that morning are certainly *part* of the probable cause analysis, the Court's assessment does not stop there. Instead, the Court must consider the totality of the circumstances, including all of the information known to any of the investigating officers, as long as a showing of communication has been made. *See Robinson*, 664 F.3d at 703.

Investigator Ryan's testimony at the hearing makes clear that he, Investigator McMillin, and other officers involved in Mr. Barnes's arrest were in regular communication before Mr. Barnes's arrest. On October 20th, the investigators learned that a 911 call had been placed at the 11th Street address, which they knew to be a place of interest in the Barnes investigation. (Tr. 46.) Shortly thereafter, they spoke to the responding officers and reviewed the information that they knew up to that point. (*Id.* at 46–47.) Investigator Ryan specifically testified that speaking with the other officers allowed them all to conclude that they had probable cause to arrest Mr. Barnes. (*Id.* at 47–48.) It is clear that more than just "some degree of communication" occurred between law enforcement officers on the day of Mr.

Barnes's arrest.  Thus, the Court considers the entire universe of information that law enforcement knew when they arrested him.

Examining the information as a whole, there is no doubt that the arresting officers had probable cause to believe a criminal offense had been or was being committed.  First, as a result of their ongoing investigation, the officers had evidence from a variety of sources regarding Mr. Barnes's involvement in drug trafficking crimes.  Officers knew that Mr. Barnes had been seen in jail with significant cash and had spoken about drug dealing activities with other inmates.  They knew that he paid for extravagant items such as expensive cars in cash, but that he did not put the cars in his own name.  Officers also had information regarding a party where overdoses due to bad drugs had occurred on September 30, 2017.  (Tr. 41.)  A partygoer identified a man named "Frederick" who drove a white Dodge Charger as providing drugs to the party.  (*Id.*)  She told officers that he fled once the bad reactions began. (*Id.*)  Geolocation information from Mr. Barnes's phone placed him at the area of the party that night.  (*Id.* at 42.)

Most importantly, several informants had told law enforcement that they had purchased drugs from a black man named New York, who the officers knew to be Mr. Barnes.  One of those informants had told officers that Mr. Barnes had mailed drugs to the 11th Street address in the past.  And officers had GPS data that indicated that Mr. Barnes was at or in the vicinity of the 11th Street address around the time that the package was dropped off.  It was entirely reasonable for officers to believe that Mr. Barnes was involved in a serious drug trafficking offense on October 20, 2017 at the Hoerner residence.

Mr. Barnes focuses on discreet facts that he says demonstrate that the officers did not have probable cause.  For example, Ms. Cada only took a photo of one man in a black sweatshirt who was not Mr. Barnes.  However, Ms. Cada told responding officers that another man wearing a red sweatshirt had also been present at the house asking for the package.  (Tr. 64.)  The government suggests that this person was Mr. Barnes, although his identity remains unconfirmed.  Mr. Barnes, however, notes that when he was arrested about an hour later, he was not wearing a red sweatshirt but a gray t-shirt, and no red sweatshirt was found.  (*Id.* at 83.)  He also highlights the fact that he was found with a different car than the Dodge Charger that Mr. Hoerner told

officers Mr. Barnes was driving.  (*Id.*) And he emphasizes that Mr. Hoerner stated that the man in the photo—definitely not Mr. Barnes—was New York. (*Id.* at 66–67.)

Examining this evidence within the totality of the circumstances, the Court finds that the evidence known to officers established probable cause for Mr. Barnes's arrest.  There was sufficient time for Mr. Barnes to change out of a red sweatshirt between the last time Ms. Cada saw him and when he was arrested.  And Mr. Barnes was known to drive different vehicles on a regular basis, so officers could infer that he changed both vehicles and clothes after Mr. Hoerner told him that law enforcement had been called.  While these facts may be marshalled before a jury in an attempt to undermine the government's substantial burden of proof at Mr. Barnes's eventual trial, they do not render his arrest unlawful.  In light of the substantial volume of incriminating facts known to officers at the time of his arrest, that arrest was supported by probable cause.

### F.    Motion to Dismiss

Mr. Barnes next argues that his indictment must be dismissed because his current federal prosecution violates his due process rights.  Mr. Barnes is currently being prosecuted for the same or substantially similar charges in state court and federal court.  Indeed, the case began in state court and proceeded there for several months before his federal indictment.  He points to recent Supreme Court decisions that question the validity of the "dual-sovereign doctrine" to raise due process concerns regarding this dual prosecution.  He also encourages this Court to dismiss his indictment for vindictive prosecution, citing the *Petite* Policy, which advises against federal prosecution for the same offense as a state prosecution.  Neither argument carries the day, and Mr. Barnes's motion to dismiss should be denied.

### 1.    Double Jeopardy

Mr. Barnes's challenge to his federal prosecution is essentially a claim that being prosecuted for the same offense simultaneously in two courts violates the constitution.  For two reasons this argument fails.  First, although Mr. Barnes may be correctly predicting a change in the law regarding the dual-sovereign doctrine, the Court is bound by the law as it exists today, and that jurisprudence forecloses his

claim. More importantly, because he has yet to be convicted in either court, his claim is at best premature.

Under the dual-sovereign doctrine, "a single act gives rise to distinct offenses—and thus may subject a person to successive prosecutions—if it violates the laws of separate sovereigns." *Puerto Rico v. Sanchez Valle*, 136 S.Ct. 1863, 1867 (2016). The states are separate sovereigns from the federal government—a fact that Mr. Barnes does not dispute. *See id.* at 1871 (citing *Abbate v. United States*, 359 U.S. 187, 195 (1959). Rather, he cites Justice Ginsburg's recent concurrence in *Sanchez Valle*, which questions the validity and consequences of the current iteration of the dual-sovereign doctrine. *Id.*, at 1877. Mr. Barnes also highlights *United States v. Gamble*, 694 F. Appx. 750 (11th Cir. 2017), *cert granted*, 138 S.Ct. 2707 (2018), a case in which the United States Supreme Court recently heard argument regarding the dual-sovereign exception to the general prohibition on multiple prosecutions for the same offense. The Supreme Court has not yet issued a decision in *Gamble*. Here, as the Eleventh Circuit noted in *Gamble*, "unless and until the Supreme Court overturns *Abbate*, the double jeopardy claim must fail based upon the dual sovereignty doctrine." *Gamble*, 694 F. Appx. At 751.

Mr. Barnes's argument on this point must fail for a second reason. Although Mr. Barnes has been charged with seemingly the same offense in both state and federal courts, he has not been convicted of a crime in either. Mr. Barnes is not protected against prosecution for the same offense until after conviction. *See, e.g.*, *Ohio v. Johnson*, 467 U.S. 493, 498–99 (1984). Moreover, although the Court recognizes that there may be unfairness as a result of simultaneous prosecution in two courts, Mr. Barnes makes no claim of prejudice or harm here, and he does not describe any way in which the state case is undermining his federal due process protections. Indeed, there is no information in the record before the Court to suggest that the state case has remained active after Mr. Barnes was indicted federally. Mr. Barnes points to no authority for the argument that a pending but inactive state case somehow violates his federal constitutional rights. His motion to dismiss the indictment on this basis should be denied.

## 2.      Vindictive Prosecution

Mr. Barnes also argues that the government is violating his due process rights by engaging in a vindictive prosecution. Vindictive prosecution occurs when the government punishes a defendant for exercising valid legal rights, rather than for committing a crime. *United States v. Robinson*, 809 F.3d 991, 1000 (8th Cir. 2016). Demonstrating prosecutorial vindictiveness is not easy. "The defendant bears the 'heavy' burden to show that the prosecution was vindictive, in light of the discretion prosecutors are given in performing their duties." *Id.* (citing *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004). In the absence of objective evidence, "a defendant may, in rare instances, rely upon a presumption of vindictiveness if he provides sufficient evidence to show [that] a reasonable likelihood of vindictiveness exists." *United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015) (citation and quotation omitted). The Court concludes that Mr. Barnes has not carried this burden.

Mr. Barnes argues that because his dual prosecution is against the *Petite* Policy, the Court should find that an improper motive for that prosecution exists. This argument does not carry the day. First, the Court notes once again that Mr. Barnes has not been convicted in state court; thus, the *Petite* Policy does apply in this circumstance. Moreover, the *Petite* Policy is "an internal Department of Justice policy that prohibits a federal prosecution of a defendant who has been convicted in a state court for the same conduct unless the subsequent federal prosecution is specifically authorized by the Attorney General." *Leathers*, 354 F.3d at 962 n.5. The Eighth Circuit has repeatedly rejected the suggestion that a prosecution that violates the Policy is necessarily vindictive. *See, e.g.*, *id.* at 962–63; *United States v. Basile*, 109 F.3d 1304, 1308 (8th Cir. 1997); *United States v. Lester*, 992 F.2d 174, 176 (8th Cir. 1993). The *Petite* Policy is a discretionary policy that "does not confer any substantive rights and its application cannot form the basis for a claim of improper prosecution." *Leathers*, 354 F.3d at 962.

Mr. Barnes points to other circumstances that he argues support dismissal due to vindictive prosecution. He highlights a statement made by Investigator McMillan during a post-arrest interview, which he characterizes as a threat of federal prosecution. Specifically, Investigator McMillin stated: "Talk to your lawyer, if you are willing to cooperate, we will try to keep feds off your back. I got a call today from

24

LeeAnn Bell [the federal prosecutor in this case], she wants you back.  That is all I am going to say." (Plf.'s Mem. at 33.)  This statement does not rise to the level of evidence of vindictive prosecution.  First and foremost, this statement appears to be a standard effort to persuade someone to cooperate by threatening more serious consequences if they do not.  Investigator McMillin is a state police officer, not a federal prosecutor.  He has no authority to choose what cases the federal government prosecutes.  And even if he did, a truthful statement that a federal prosecutor is considering bringing federal charges against a person with a prior federal drug conviction evidences the exercise of prosecutorial discretion, rather than vindictiveness.[6]

## III.    Recommendation

In sum, for the reasons set forth above, the Court concludes that Mr. Barnes's challenges to the constitutionality of the proceedings in this matter do not carry the day.

Accordingly, the Court makes the following recommendations:

1.    Mr. Barnes's Motion to Suppress (ECF No. 43) be DENIED;

2.    Mr. Barnes's Motion to Dismiss Indictment (ECF No. 49) be DENIED; and

3.    Mr. Barnes's Supplemental Motion to Suppress (ECF No. 51) be DENIED.


Date:  April 8, 2019                                  s/ Katherine Menendez
                                                              Katherine Menendez
                                                              United States Magistrate Judge

---

[6] Mr. Barnes also highlights the significant delay in the execution and return of the Wells Fargo warrant as further evidence of vindictive prosecution.  He provides no additional support for this argument, and the Court finds none.